OPINION OF THE COURT
Edward J. Greenfield, J.
Plaintiffs have moved to reargue the prior decision of this *835 court dated September 4, 1984, denying their motion to enjoin defendant Herbert Citrin from subletting an apartment they claim rights to. Alan Citrin, son of defendant Herbert Citrin, has moved to intervene, and his motion has previously been granted. Defendant Herbert Citrin has cross-moved to dismiss the complaint for failure to state a cause of action under CPLR 3211 (a), and defendant Melohn Properties has moved for summary judgment pursuant to CPLR 3212 as against defendant Herbert Citrin. All motions are consolidated for disposition.
The controversy arises out of the following facts. The premises at 100 Riverside Drive are owned by defendant Melohn Properties (Melohn). Defendant Herbert Citrin is the lessee of Penthouse A, in which he resides. In 1973, landlord Melohn gave Citrin a lease for the adjoining penthouse apartment, Penthouse B. It was understood by all concerned that Herbert Citrin would not ever reside in Penthouse B. Melohn granted him permission to sublet it and subdivide it at his own expense provided he met with all legal requirements. Penthouse B was thereupon sublet by Citrin to two subtenants. At some point between 1973 and 1982, without complying with legal requirements, and without obtaining a new certificate of occupancy, Penthouse B was subdivided by Citrin into three separate dwelling units thereafter designated as PHB, PHC and PHD.
On May 24, 1977 Citrin sublet the unit known as PHB to plaintiffs Paul and Julie Conti. Their sublease, which was renewed, expired on December 31, 1984. Before that date, the Contis commenced this action to establish their rights.
Plaintiffs contend that Citrin promised that when units PHC and PHD became vacant, he would reunite the three units and give them occupancy of the entire premises, originally designated as Penthouse B. When PHC and PHD became vacant in August 1983, the Contis asked to be permitted to occupy the entire premises, but Citrin allegedly reneged on his oral promise to reunite the subdivided premises and the Contis brought suit to compel Citrin to adhere to his promise.
Upon the prior motion, this court held that since the promise was not in writing, it could not be enforced under the Statute of Frauds. Upon this motion for reargument, the Contis contend that there was part performance in that they tendered a $20,000 check to Citrin, further that Citrin is in fact an illusory tenant who has forfeited his rights, and that *836 they have been the victims of rent overcharges, and they request appropriate relief. Alan Citrin, the son of Herbert Citrin, contending that since September 1983 he has been a bona fide resident of the PHD portion of Penthouse B whose interests might be adversely affected, has moved to intervene. At a session in chambers thereafter, his counsel was informed that the motion to intervene was granted, and that he could contest the Contis’ motion, and assert his own interest in the premises.
The assertion by Paul Conti that Herbert Citrin had agreed to make Penthouse B in its entirety available, and that the agreement was substantiated by a $20,000 check which Paul Conti made out and tendered to Citrin (check No. 2178 of Aug. 24, 1983) will not suffice to render the agreement enforceable, since Citrin neither accepted nor deposited the check. The other grounds now raised by the Contis on the present motion, although not previously asserted, are of greater validity and significance.
The major contention to be considered on this application is whether Citrin, the purported prime tenant, is actually an "illusory tenant”, and if so, what consequences follow. The law with respect to illusory tenancies has been developing rapidly in the last few years. As outlined in a comprehensive opinion (Hutchins v Conciliation & Appeals Bd., 125 Misc 2d 809, 811 [Evans, J.]) an " 'illusory tenant’ * * * denotes a lessee of residential premises who does not occupy the premises for his own residential use and who subleases it for profit, not because of necessity or other legally cognizable reason.”
There are two situations where the term "illusory tenant” has been used: one is to describe a straw man who, as alter ego of the landlord, subleases the apartment to permit the landlord to circumvent or evade his obligations under the rent laws. (Matter of Hiyee Realty Corp. [New York City Conciliation & Appeals Bd.], NYLJ, May 5, 1982, p 6, col 1 [Alexander, J.].) Such an illusory tenancy has been expressly condemned in Yellon v Reiner-Kaiser Assoc. (89 AD2d 561). (Cf. Stutt v Unique Restorations Co., 96 AD2d 1039.) The second type of illusory tenancy involves a prime tenant who is an individual entrepreneur trafficking in stabilized or controlled apartments which he subleases as a business. (Van Seplow v Conciliation & Appeals Bd., Sup Ct, NY County, index No. 100334/75, Asch, J.; Matter of Walsh [Conciliation & Appeals Bd.] NYLJ, Oct 14, 1982, p 7, col 4 [Rettinger, J.]; Rogal v Conciliation & *837 Appeals Bd., Sup Ct, NY County, index No. 21713/82, Evans, J.)
In an era in which a vacant apartment, particularly in Manhattan, has become rarer than gold or diamonds, public policy has viewed with increasing disfavor the practice of some individuals who seek to corner the market in such apartments, not for the necessities of their own living, but to reap a profit from the necessities of others by acquiring the leases to vacant apartments, with or without the knowing cooperation of the landlord, and subletting such apartments to others at an enhanced rental. Since the asserted policy of the rent laws is to protect those tenants who actually live in rental housing, protections have been withdrawn from those tenants who do not use the premises as their primary residence. Thus, relatively short shrift is given to those who use their apartments as an auxiliary home or pied-a-terre. Even shorter shrift is given to those who trade in controlled apartments solely as a business or as a pure moneymaking enterprise. Our courts have looked disapprovingly on the subletting apartments purely for profit, and have condemned "the opportunity to trade in apartments” (Shapiro v Dwelling Managers, 92 AD2d 52, 56).
While the right to sublet is statutorily protected by Real Property Law § 226-b, that right is not accorded to create a new class of landlord. (Vance v Century Apts. Assoc., 93 AD2d 701, affd 61 NY2d 716.) As stated by Justice Evans, while subletting is permissible for the limited purpose of allowing a residential tenant in actual occupancy to retain his home when a temporary absence becomes necessary, a sublease "is not an ordinary commodity to be bought and sold without restriction.” (Hutchins v Conciliation & Appeals Bd., supra, p 817; see, Matter of Krantz v New York City Conciliation & Appeals Bd., 57 NY2d 915.) As stated by Justice Cohen in Matter of Landerson (New York City Conciliation & Appeals Bd.) (NYLJ, July 17, 1980, p 4, col 2) the parties must be bona fide in order to be held to the terms of the lease. "At a time of such grave housing shortage tenants find it increasingly difficult to find adequate housing at a reasonable cost. The illusory tenant artificially manipulates an already strained market; he effectively diminishes the pool of stabilized apartments and inflates the general rent level. Conversely, at a time when property owners incur increased costs and are limited by law to a certain level of return, it is anomalous to permit a tenant who has often made no capital investment and who ordinarily *838 incurs minimal operating expenses, to speculate on someone else’s investment, potentially without limitation. Since an illusory tenant is acting contrary to the law he cannot avail himself of its protection. He would therefore not be entitled to primary tenant status and the right to a renewed stabilization lease.” (Hutchins v Conciliation & Appeals Bd., supra, pp 817-818.)
Applying the law as it has developed, there is little difficulty in arriving at the conclusion that Herbert Citrin is, by every applicable standard, an illusory tenant. When he first acquired the lease for Penthouse B from Melohn, he had no intention of residing in it, as he was already comfortably ensconced in Penthouse A. His acquisition of the lease to Penthouse B was purely a moneymaking proposition, as he intended to sublet the unit to multiple tenants, receiving from them rents considerably in excess of what he was paying, and what was permitted under the rent stabilization laws. Further, he could also be considered an illusory tenant in the first sense, a pliant alter ego for the landlord as exemplified in Yellon v Reiner-Kaiser Assoc. (supra). His lease guaranteed the landlord in advance that he would present no opposition to any proposed plan to co-op the building, and he promised to deliver it vacant to the landlord if he did not purchase it himself.
What are the consequences if a sublessor is in fact an illusory tenant? The Conciliation and Appeals Board (CAB), the predecessor of the agency presently administering the rent stabilization laws, the Department of Housing and Community Renewal (DHCR), has consistently taken the position that when there is an illusory tenancy the owner will be required to recognize the actual occupant as the real tenant, disregarding the illusory tenant. The occupant is then entitled to a renewal lease in his or her own name at the lawful stabilization rent. The illusory prime tenant is then legally responsible for refunding all overcharges collected from the occupant. If the building owner received part or all of the overcharge, the owner will also be required to refund the rent overcharge it received.
In this case the situation is exacerbated by the fact that defendant Citrin was evidently subletting for profit in multiple locations. During a conference in chambers, this court inquired of Mr. Citrin whether he had ever sublet other premises for profit, and he emphatically assured the court that he had not. It now turns out, as revealed in a supplemen *839 tary affidavit filed by the plaintiffs, that Herbert Citrin had been held within the year by the DHCR to be an illusory tenant with respect to an apartment he sublet in Great Neck, New York. That finding was affirmed by the Supreme Court, Nassau County, on May 9, 1984 by Justice Robbins (Citrin v Department of Hous. & Community Renewal, index No. 47/84). Mr. Citrin, as a lawyer and as a businessman, certainly had to be aware of this during the pendency of these proceedings.
In the Nassau County case Citrin entered into a lease for an apartment in Great Neck and promptly sublet it, ultimately to Mr. and Mrs. Jones, at a rental 50% in excess of the legal regulated rent. As he did with the Contis in this case, he had earlier offered to sell his rights in the apartment to the Joneses. Then he claimed, just as he does in this case, that he needed the apartment for the use of his son, who was a resident doctor at Mt. Sinai Hospital in Manhattan. The DHCR found, and its finding was confirmed by the Supreme Court, that Citrin was an illusory tenant hoping to make a profit through subletting, and decreed that the Joneses, as subtenants, were entitled to the prime lease, and were to pay their rent at the legal rate directly to the owner. Citrin was held responsible for repaying the subtenants three times the rent overcharge together with the attorneys’ fees.
Having failed in Great Neck, Mr. Citrin had no compunctions about taking the very same discredited position in this case, and brazenly told this court, despite the public record of the Nassau County case, that he had never sublet any other apartment. He appears to have lied along the same lines in the Nassau County hearing. When he was asked there if he had ever sublet an apartment before, despite his experience at 100 Riverside Drive, he answered, "No”. Then, just as he had in Great Neck, he makes the claim here that the premises are needed, in part, by his son the doctor, even though his son had already been occupying an apartment on which he paid rent at 1249 Park Avenue, near his hospital.
The son, Alan Citrin, claims to have been a resident of the PHD portion of Penthouse B since the end of August or early September, a tenancy which the Contis claim is spurious. Conti alleges that he was told by Herbert Citrin: "My son [Alan] is in Penthouse D for one reason and for one reason only — to protect my rights.” Conti further asserts that Alan Citrin told him that his father wanted him to move into Penthouse D, on which he would not have to pay rent, but that he stated: “I’d be crazy to give up my Park Avenue *840 apartment.” Alan is alleged to have further stated that on the conclusion of his medical residency he would be moving. That appears now to have come to pass. Conti has also set forth the recorded message which was played upon a call being placed to Alan Citrin’s telephone at 100 Riverside Drive. The message states "Hi, this is Alan Citrin. You know I’m never here so you better leave a message, otherwise, I’ll never get back to you.”
The Contis have now filed a further supplementary affidavit, buttressed by photographs, to support their contention that Alan Citrin’s purported occupancy was in fact a sham tenancy, and that he has now vacated the premises. Alan Citrin’s attorney, in an affidavit, does not deny that Alan has physically moved from the apartment and is now a resident of Houston, Texas, although he is alleged to have left some of his possessions behind.
One is led to wonder how many apartments Herbert Citrin claims his son Alan needs at one and the same time. Undeniably, Alan had a lease and paid the rent on an apartment at 1249 Park Avenue. At the very time Alan Citrin is claimed to have taken occupancy of PHD at 100 Riverside Drive, Herbert Citrin swore under oath that his son had just commenced his medical residency at Mt. Sinai and the following ensued:
"Q: Where is he [Alan] residing now? [Sept. 26, 1983]
"A: Nowhere where he should be residing. He shares an apartment with two other residents in an area of Manhattan known as the Barrio, completely surrounded by people of Puerto Rican ethnic backgrounds * * *
"Q: Has he [Alan] signed a lease?
"A: The premises are owned by the hospital. They [inaudible].”
Herbert Citrin, claiming he needed the Great Neck apartment for his son Alan, who could not suffer the indignity of living in the Barrio on Park Avenue and 96th Street, made no claim in the Nassau proceedings on September 26, 1983 that Alan had found other quarters and was already living in PHD at 100 Riverside Drive. But Alan now swears that he took occupancy of PHD almost immediately after it became vacant in mid-August of 1983, although in another affidavit the date is put at early September 1983. It is apparent that Herbert Citrin has been less than candid, and that when he is pressing his claim to an apartment, truth falls by the wayside. Now it appears that Alan also lives in Texas. While it well could be *841 concluded from the facts that the tenancy of Alan Citrin is a sham and a pretext, for which it has not been shown that Herbert Citrin receives any rent, and that it is a ploy to keep the Contis from claiming the entirety of Penthouse B, this court need not at this time resolve the matter as a question of fact.
No resolution of disputed questions of fact are necessary, despite the accusations and counteraccusations the parties have hurled at one another. The court has no trouble in concluding, as a matter of law, on the undisputed facts, that an illusory tenancy exists. Under ordinary circumstances, as was the situation between Mr. Citrin and the Joneses in Great Neck, the rights of the illusory tenant are canceled out, and the subtenants in occupancy succeed to the status of prime tenants, dealing thereafter with the building owner directly. Here, however, the sublease had accorded to the Contis the right of occupancy to only a portion of Penthouse B. What happens with respect to the remainder of that apartment?
It is clear that the attempted subdivision of Penthouse B without permits or a certificate of occupancy was unlawful and a nullity. Penthouse B was regarded by the Building Department and by the CAB and DHCR as a single unit, as to which a stabilized rent had been fixed, and the unilateral acts of Mr. Citrin in attempting to subdivide it and get more rent could not change that. When there is a unitary apartment, and the illusory tenant is canceled out, the subtenants succeed to the whole. The matter would be more complicated if all three groups of subtenants were still in occupancy, but they were not. On the date that the last remaining subtenant vacated, only the Contis remained in possession. Whether sham or bona fide, indisputably Alan Citrin arrived on the scene some time later. But the rights of the parties were fixed before he ever appeared.
As of mid-August 1983, in the eyes of the law, Herbert Citrin was an illusory tenant, and his subtenants were entitled to succeed to his interest. The other subtenants were gone. Who has the superior claim to the space they vacated? Not Herbert Citrin. Since he already occupies his own apartment, and his attempt to subdivide Penthouse B was unlawful and a nullity, why should he be permitted to continue to attempt to sublet the improperly fractionated units? And if, as a matter of public policy, he may not do that, why should he have to pay rent for space which he cannot legally occupy or sublet? Even if he could somehow legally sublet it for a short *842 period, his lease is soon to expire and the landlord is not required to renew the lease of one who does not use the apartment as his primary residence.
Is the landlord’s claim superior? At the outset, at least, it was in pari delicto in the creation of the illusory tenancy. It relinquished dominion over the use of the space for the term of the lease. It never took steps to legalize the subdivision of the apartment, and it continued to accept rent over and above the legal limit. Under the circumstances, it too can effectively do nothing with the remainder of the apartment. The Contis, as the sole remaining subtenants as of mid-August 1983, succeed to the rights of the illusory tenant, and are to be " 'accorded the full rights of tenants under the Rent Stabilization Law and Code’ ” (Stutt v Unique Restorations Co., 96 AD2d 1039, 1040, supra). This is precisely what was done in Citrin v Department of Hous. & Community Renewal (Sup Ct, Nassau County, supra). (Cf. Goldberg v Horowitz, NYLJ, June 30, 1983, p 11, col 1 [Sup Ct, NY County, Greenfield, J., index No. 11272], affd 107 AD2d 1095 [Jan. 1985] [to the effect that the subtenant can succeed to the illusory tenant’s right to purchase the apartment on co-oping].)
What is it that the subtenants succeed to? So far as the law is concerned, the subdivision of the apartment never having received legal recognition, Penthouse B must be considered an entire undivided unit. Just as in Cooper v Schube (86 AD2d 62), a party simply cannot alter the established legal status of the building by pointing to a prior, temporary unauthorized use. The legal status of the premises is governed by the applicable certificates of occupancy, and the mere fact that someone has circumvented the Building Department’s standards by attempting to create an additional rental unit is of no legal consequence. (Supra, p 66.) As occupants on the date that the last remaining tenant vacated, the Contis succeeded to the rights of the illusory tenant, and his right to the lease on Penthouse B. In the eyes of the law, Penthouse B was an entire undivided unit. The scheme pursuant to which Herbert Citrin attempted to subdivide the apartment and rent to three separate subtenants never received legal recognition. No permit was granted to create three separate apartments out of the one, and of course, no certificate of occupancy for three separate units was ever issued. True it is that Citrin sublet Penthouse B to the Contis and two other subtenants, and if all three were still occupying the premises there would have to be a Solomonic decision as to entitlement to possession or divi *843 sion among the three. The fact is that the other subtenants have vacated the premises, leaving the Contis as the sole subtenants. As of mid-August 1983 they were the sole persons remaining entitled to succeed to the interest of the illusory tenant in the undivided apartment. Nothing that happened thereafter, including the attempted interposition of Alan Citrin in one of the subdivided units, could alter their legal status.
The Contis allege that Citrin had, in fact, promised them that they could occupy the entire premises when the other subtenants moved out. Even though this court previously held that the promise was legally unenforceable as such, when the premises were vacated by the other subtenants, which occurred in mid-August 1983, the Contis, as a matter of law, became entitled to succeed to Citrin’s status. Since the attempted subdivision was illegal, and Herbert Citrin’s interest therein was illusory, the sole subtenants, under the law, had the paramount claim to the entirety of Penthouse B. The subsequent attempts by Herbert Citrin to install his son in a portion of the premises was ineffective as a matter of law from preventing the merger and coalescence of the entire unit. The premises, unsubdivided, revert to their original stabilized status as a single apartment for which the subtenants, on taking occupancy of the entire apartment, are obliged to pay the established rent for the undivided unit.
There appears to be a misimpression on the part of Citrin’s attorney that the question of illusory tenancy and its legal effects cannot be appropriately considered by the court because it is not raised under the original pleadings. The fact is, however, that the court has consolidated motions before it which include not only counsel’s motion addressed to the sufficiency of the complaint, and plaintiffs motion to enjoin any subletting of the vacant portion of Penthouse B, but also Melohn’s motion for summary judgment asking for a declaration that Herbert Citrin does not occupy the premises as his primary residence. The complaint sets forth all the essential facts, and the demand of the Contis for the entirety of Penthouse B, and asks for an adjudication to that effect. The court is thereupon obligated to declare the respective rights of the parties. (Mangicapre v Town of Hempstead, 97 AD2d 788.) On a motion for summary judgment, the court must search the record, and can grant such judgment to any party as it deems appropriate. (CPLR 3212 [b]; Fertico v Belgium Phosphate Chem., 100 AD2d 165; Forgione v Town of Harrison, 91 AD2d *844 1012.) An action for declaratory judgment concerning primary residence is ripe for adjudication, even prior to the expiration of the prime lease. (Sharp v EUE Screen Gems, Sup Ct, NY County, Aug. 21, 1984, Greenfield, J., index No. 26923/83.) All the facts, as set forth in the various affidavits, are to be considered. If, on the undisputed facts the law can be discerned and declared, a court will do so according to the situation presented, without requiring the technicality of amended pleading. All parties have been fully on notice as to the basis for the application of the plaintiffs, who appear pro se, the court can declare their rights as a matter of law.
Accordingly, on the basis of such undisputed facts as are before me, I find:
1. Herbert Citrin is an illusory tenant of Penthouse B and has no rights in said apartment vis-á-vis his purported subtenants, the Contis.
2. Plaintiffs, the Contis, are entitled to the prime lease on the entirety of the premises of Penthouse B, all other legitimate subtenants having vacated.
3. Alan Citrin, the son of the illusory tenant, was put into a portion of the apartment, PHD, after the rights of the Contis to the prime lease on the entire premises had already accrued.
4. Penthouse B has never been legally subdivided into three units, and the certificate of occupancy permits only a single unified apartment in that space. It appears that plaintiffs may have been paying a rent in excess of the legal rent for the entire Penthouse B.
5. Plaintiffs appear to have been charged for PHB a disproportionate part of the legal stabilized rent for the entire Penthouse B. The matter should be remanded to the DHCR in order to determine what was the maximum legal rent for their portion of the premises, and what the legal rent will be for the entirety of Penthouse B for the future.
6. Defendant Herbert Citrin shall pay to the plaintiffs three times the rent overcharges as determined by the DHCR.
7. Defendant Herbert Citrin shall be directed to pay to the plaintiffs their attorney’s fees and disbursements pursuant to 22 NYCRR 2106.1.
8. The cross motion of defendant Herbert Citrin is denied in all respects.
9. The motion by defendant Melohn Properties for summary judgment is granted to the extent of declaring that Herbert *845 Citrin does not occupy the subject premises as his primary residence, but inasmuch as the plaintiffs, as subtenants, are entitled to the prime lease, the motion to declare the premises exempt from the rent stabilization laws is denied.
The matter will now have to be remanded to the DHCR, to determine what the legal rent was, and what is the amount of overcharges and penalties to be assessed. The DHCR will also have to determine the appropriate rent to be fixed for the unsubdivided premises, from the time that the Contis take occupancy of the entire premises.