FERTICO BELGIUM, S.A., Respondent, v PHOSPHATE CHEMI-CALS EXPORT ASSOCIATION, INC., Appellant.

First Department, March 6, 1984

#### APPEARANCES OF COUNSEL

*Michael L. Anania* of counsel (*John J. Witmeyer, III,* with him on the brief; *Ford Marrin Esposito & Witmeyer,* attorneys), for respondent.

*Charles H. Critchlow* of counsel (*Norman H. Seidler* and *Douglas F. Broder* with him on the brief; *Lord, Day & Lord,* attorneys), for appellant.

#### OPINION OF THE COURT

SULLIVAN, J.

On October 18, 1978, Phosphate Chemicals Export Association, Inc. (PhosChem), an American exporter of fertilizer products, agreed to sell 35,000 metric tons of phos-

phate fertilizer to Fertico Belgium S.A., a Belgium-domiciled, international trader of various commodities, including fertilizer. The fertilizer was to be shipped to Antwerp C.&F., and delivered in two installments — 15,000 metric tons between November 1 and 15, 1978, and the balance by November 30, 1978. Although the contract did not specify a date for the fertilizer's arrival in Antwerp, time was allegedly of the essence since Fertico was contractually obligated to ship 12,000 metric tons to Baghdad by November 25. Fertico was required to open a confirmed irrevocable letter of credit in PhosChem's favor through a reputable United States bank no later than October 30, 1978. Shipment was to be within 15 days after receipt of the letter of credit.

On November 2, 1978, Fertico's bank, The Banque de Paris et des Pays-Bas Belgique S.A. (Paribas), notified the Irving Trust Company by telex that an irrevocable documentary credit in the amount of $1,725,000 was being opened in PhosChem's behalf. Irving Trust, in turn, advised PhosChem of the credit and the conditions thereof on November 6, 1978. Fertico, through Paribas, subsequently amended the conditions of the letter of credit and advised Irving Trust that no written confirmation would follow. On November 10, 1978, Irving Trust notified PhosChem of the amendments and confirmed the credit.

Irving Trust's confirmation specified shipment from an "East or Gulf US Port" to Antwerp C.&F., and provided for payment against presentation to it of various documents including, "[f]ull set clean onboard ocean bills of lading * * * dated onboard not later than November 8, 1978" and "[c]opy of your telex sent to Fertico Belgium S A advising name of ship, sailing date, weight and Eta Antwerp, the same date as end of loading, and certified true." Irving Trust's confirmation, as well as its original advice, further advised that the credit was subject to the Uniform Customs and Practice for Documentary Credits [1974 Revision], International Chamber of Commerce Publication 290 (UCP).[1]

---

1. The Paribas telexes, upon which Irving Trust issued its advice and subsequent confirmation, did not differ in substance. They likewise stated that the credit was subject to the UCP. They specified C.&F. shipment "from East or Gulf US port to Antwerpen at latest 8th November 1978". Payment under the credit was conditioned on presentation of a "certified true copy of telex from beneficiaries to our principals advising name of ship

Thus, since the letter of credit was subject to the UCP, article 5 of the Uniform Commercial Code — letters of credit — does not apply. (Uniform Commercial Code, § 5-102, subd [4].) The UCP, however, is by definition a recording of practice rather than a statement of legal rules. (Harfield, Practice Commentary, McKinney's Cons Laws of NY, Book 62½, Uniform Commercial Code, § 5-114, p 686.)

After receiving Irving Trust's advice that an irrevocable credit had been issued in its favor, PhosChem chartered a cargo ship, the *Scanspruce,* and arranged for 15,000 metric tons of fertilizer to be promptly delivered onboard. Loading was completed by November 8 and onboard bills of lading, the accuracy of which is not in dispute, were issued bearing that date. That same day, PhosChem sent the following telex to Fertico:

"The M/V Scanspruce sailed from Tampa, Florida on November 8, 1978 carrying a total of 14805.580 metric tons granular triple superphosphate and is due to arrive in Antwerp on December 4, 1978.

"We certify the above to be true and correct."

In fact, the *Scanspruce* took on other cargo and did not leave port until November 11. PhosChem so advised Fertico, both orally and in writing, on November 16.

Earlier, however, on November 3, Fertico, on learning that the *Scanspruce* was not due in Antwerp until December 4, had complained to PhosChem that the fertilizer would arrive too late to complete the resale transaction to which it was committed. On November 13, 1978, Fertico reiterated this complaint and advised PhosChem that it was sending a representative to Baghdad in an effort to renegotiate the resale.

Notwithstanding its concern Fertico did not advise Irving Trust or Paribas of any problem with respect to the transaction; nor did it request either bank to withhold payment on the credit. PhosChem did not present its draft and the various documents required by the letter of credit to Irving Trust until November 17. Payment was made on or about November 21. Among the documents presented was PhosChem's November 8 telex to Fertico certifying a

— sailing date — weight and ETA Antwerp, the same date as end of loading."

November 8, 1978 sailing. The *Scanspruce* did not arrive in Antwerp until December 17, 1978. Unloading of the fertilizer was undertaken on December 20, 1978. Fertico took possession of the goods, held them, and resold them to a customer in Antwerp at a gross profit of approximately $400,000.

Almost three years later, in October, 1981, Fertico commenced an action against PhosChem, asserting, *inter alia,* causes of action in breach of contract and fraud and conversion.[2] In the contract action, in which damages of $1,250,000 were sought, Fertico alleged that "[t]imely delivery by PhosChem of the [fertilizer] to plaintiff was essential, and was known to PhosChem to be essential to plaintiff, for it to fulfill its contractual obligations". Specifically, Fertico contends that PhosChem was contractually obliged to assure that the *Scanspruce* would arrive in Antwerp by a certain date and, as part of this obligation, agreed that it would set sail by November 8, 1978 and proceed directly to Antwerp. Instead, the *Scanspruce* made a stop at Hamburg before proceeding to Antwerp.

The fraud and conversion cause of action incorporated the contract allegations. Additionally, Fertico contends that PhosChem's November 8 telex contained fraudulent misrepresentations and that in reliance thereon it "[a]llowed Irving Trust Company to pay to PhosChem in excess of $1.7 million, to which PhosChem was not entitled." Thus, Fertico alleged that PhosChem's drawing on the letter of credit constituted actionable fraud and conversion.

PhosChem moved to dismiss the fraud and conversion cause of action for failure to state a cause of action (CPLR 3211, subd [a], par 7). Fertico cross-moved for partial summary judgment on the same cause of action on the issue of liability. While agreeing with PhosChem that "[t]he alleged fraud is not an independent transaction but rather an integral part of defendant's alleged failure to timely perform the contract", Special Term nevertheless refused to dismiss the conversion claim, finding that "[t]he letter of credit is property * * * of its maker plaintiff Fertico

---

2. The complaint alleged four causes of action. The first dealt with a separate commercial transaction. The fourth, naming the members of PhosChem, an association, as additional defendants, has been dismissed.

separate and apart from the underlying transaction". Reasoning that the terms of the letter of credit were not met because "the sailing occurred after November 8, and was not direct to Antwerp", Special Term concluded that "[u]nder such circumstances, [PhosChem] did not at the time of encashment have any entitlement to the funds", and awarded Fertico partial summary judgment on its conversion claim. An assessment of damages was directed.

Even assuming, *arguendo,* that a cause of action for either fraud or conversion is stated, the grant of summary judgment in Fertico's favor on the conversion claim was clearly erroneous since the factual premises underlying Special Term's determination either do not find support in the record or are, at the very least, in issue.

Special Term found that PhosChem did not comply with the terms of the letter of credit in two respects, one of which, direct shipment to Antwerp, was not even a specified condition. The letter simply specified "shipment from East or Gulf US Port to Antwerpen C & F Antwerpen." Only transhipment, i.e., the transfer of goods from one ship to another, was prohibited, and only the *Scanspruce* transported Fertico's cargo.

In a C.&F. contract, such as is involved here, the seller "must * * * put the goods in the possession of * * * a carrier and make such a contract for their transportation as may be reasonable" unless otherwise agreed. (Uniform Commercial Code, § 2-504, subd [a].) The reasonableness of particular transportation arrangements turns on a review of the "circumstances of the case". (Uniform Commercial Code, § 2-504, subd [a].) Although Fertico is obviously challenging the propriety of PhosChem's shipping arrangements, the letter of credit did not require that the vessel carry Fertico's cargo alone, that it proceed by any particular route or that Fertico's cargo be given any priority in unloading. These are matters totally extraneous to the text of the letter of credit and irrelevant to its interpretation.

A letter of credit is a commitment by a bank to pay under the terms of the credit upon presentation of specified documents, not upon occurrence of the events purportedly represented by the documents. (*United Bank v Cambridge*

*Sporting Goods Corp.,* 41 NY2d 254, 258-259; UCP, General Provisions and Definitions [c] and art 9.) An issuing or confirming bank presented with a demand for payment is concerned only with whether the description of the documents listed in the letter of credit has been met. Thus, Irving Trust was not obliged to look beyond the letter's specified conditions to check the particulars of shipping arrangements. (See *O'Meara Co. v National Park Bank,* 239 NY 386, mot for rearg den 240 NY 607.)

Special Term also found that PhosChem failed to comply with the letter of credit because "the sailing occurred after November 8". In so finding, Special Term ignored the accepted meaning of a specified condition of the letter of credit and substituted its own interpretation. Irving Trust's confirmation of the letter of credit, in which it undertook to honor drafts drawn under the credit (see *Venizelos, S.A. v Chase Manhattan Bank,* 425 F2d 461; UCP art 3; see, also, Uniform Commercial Code, § 5-107, subd [2]), required only that shipment be effected by November 8. More specifically, it conditioned payment upon presentation of, *inter alia,* onboard bills of lading dated no later than November 8, 1978, while the Paribas telex required "shipment from East or Gulf US port to Antwerpen at latest 8th November 1978". No matter which clause is used as the operative text of the letter of credit the result is the same. November 8, 1978 was the date of shipment.

Under article 15 of the UCP the date of the onboard bill of lading is the date of shipment, and "sailing" — if used to denote the latest date for shipment — "will be understood to be synonymous with 'shipment'" (UCP art 40). Thus, even if the letter of credit had specified "sailing" by November 8, instead of shipment, the condition would have been satisfied by the bills of lading date since that date was also the date of shipment.

Moreover, the term "sailing" appears only in the description of the telex PhosChem was to send to Fertico, a copy of which was to be presented to the bank, advising Fertico of, *inter alia,* the name of the ship and sailing date. Since this document was neither a shipping nor insurance document or commercial invoice, the contents of which a bank is obliged to scrutinize carefully, but rather a collateral docu-

ment, it was subject only to cursory examination. (*Courtaulds North Amer. v North Carolina Nat. Bank,* 528 F2d 802, 806; see UCP art 33.) The bank was not required to demand more than that which was explicitly set forth in the description of the telex. PhosChem was merely required to advise Fertico of the sailing date. The telex description did not specify a particular date by which sailing had to occur. Thus, PhosChem's November 8 telex certifying that the *Scanspruce* sailed from Tampa on November 8 was neither false nor deceptive on its face. Finally, it should be noted that, contrary to Fertico's claim, the December 17 arrival of the *Scanspruce* was not violative of the terms of the letter of credit since the letter failed to specify a delivery date. Consequently, Fertico's cross motion for summary judgment on the fraud and conversion action should have been denied in its entirety.

A motion for summary judgment, irrespective of by whom made, invites a court, even on appeal, to search the record and to award judgment where appropriate. (CPLR 3212, subd [b]; see *Wiseman v Knaus,* 24 AD2d 869.) An argument could be advanced for the award of summary judgment to PhosChem on the fraud and conversion action, despite its failure to request such relief, on the ground it has demonstrated its right to payment under the letter of credit. We need not reach that issue, however, since we find that, quite apart from the issue of whether the conditions of the letter of credit were met, the fraud and conversion claims are fatally deficient in stating a cause of action.

Fertico's tort claims are based on two allegations — PhosChem did not ship the fertilizer until November 11, causing its late arrival in Antwerp, and resulting in lost profits for Fertico on its contemplated resale; and Phos-Chem drew on the letter of credit, thereby wrongfully depriving Fertico of $1.7 million, on the basis of a fraudulent misrepresentation that the fertilizer was shipped on November 8, 1978. Even if proven, however, these allegations do not provide a basis for finding PhosChem liable in conversion, fraud or any other tort. Any lost profits resulted not from the payment to PhosChem under the letter of credit but from the allegedly untimely delivery of fertilizer which Fertico required to fulfill other contractual

obligations. Inasmuch as no duty existed to assure timely delivery, however, contractually, Fertico's remedy for its claims of late delivery and consequent damages lies in its breach of contract cause of action and not in tort. (*Laudisi v American Exch. Nat. Bank,* 239 NY 234, 243; see *Shanghai Commercial Bank v Bank of Boston Int.,* 53 AD2d 830.)

Since PhosChem was required to ship C.&F., the contract was a shipment, not a destination, contract, and delivery of the goods to the carrier was delivery to the buyer for purpose of risk and title. (Uniform Commercial Code, § 2-320, Comment 1.) PhosChem was entitled to payment upon tender of the required documents of title. (Uniform Commercial Code, § 2-320, subd [4]). The letter of credit was merely the mechanism to effect that payment.

A letter of credit represents a separate contract between the issuing or confirming bank and the beneficiary, independent of the contract for the sale of goods between the buyer and seller. (*United Bank v Cambridge Sporting Goods Corp.,* 41 NY2d, at p 259; *Foreign Venture Ltd. Partnership v Chemical Bank,* 59 AD2d 352; *Shanghai Commercial Bank v Bank of Boston Int.,* 53 AD2d, at p 830.) Thus, contrary to Special Term's finding, Fertico was not a maker of the letter of credit or even a party to the agreement embodied therein between Irving Trust and PhosChem.

Three distinct contracts are involved in a documentary letter of credit transaction: a contract between the bank and its customer by which the bank undertakes to issue a credit; the letter of credit itself, which is a commitment on the part of the issuing bank that it will pay a draft presented to it by a holder of a letter under the terms of the credit and upon presentation of the required documents of title; and the underlying contract of sale between the buyer who has procured issuance of the letter and the seller. (*United Technologies Corp. v Citibank, N.A.,* 469 F Supp 473.) "The question between the customer and the vender is the one whether the goods comply with the contract and if they do not the former has his appropriate right of action." (*Laudisi v American Exch. Nat. Bank,* 239 NY, at p 243; see, also, *O'Meara Co. v National Park Bank,* 239 NY, at pp 395-396.)

The only exception to the rule barring the customer's intervention in the separate letter of credit contract between the bank and the beneficiary is limited to instances where "fraud in the transaction" has been shown and the holder of the draft is not a holder in due course, in which event the customer may seek to enjoin the issuer of a letter of credit from honoring the demand for payment. (*Sztejn v Schroder Banking Corp.,* 177 Misc 719; see *United Bank v Cambridge Sporting Goods Corp.,* 41 NY2d, at p 259; *Bank of Montreal v Recknagel,* 109 NY 482; see, also, Uniform Commercial Code, § 5-114, subd [2], par [b].) Fertico never took any steps to enjoin payment under the letter of credit. Even if an injunction had been sought, it is doubtful that Fertico would have been successful since PhosChem's alleged misdeeds clearly do not amount to "fraud in the transaction". At most, under Fertico's interpretation of the letter of credit, PhosChem shipped the fertilizer three days late. It was precisely this type of risk — a buyer's claims of noncompliance or late delivery — against which the irrevocable letter of credit was intended to hedge so as to assure prompt payment to the seller. (See *Foreign Venture Ltd. Partnership v Chemical Bank,* 59 AD2d 352, *supra.*)

Since Irving Trust was never put on notice of facts constituting "fraud in the transaction" it was obligated to honor the demand for payment once the demand complied with the terms of the relevant credit. (UCP art 8; see Uniform Commercial Code, § 5-114, subd [1].) "In documentary credit operations all parties concerned deal in documents and not in goods." (UCP art 8.) As the Court of Appeals has noted, "Banks issuing letters of credit deal in documents and not in goods and are not responsible for any breach of warranty of nonconformity of the goods involved in the underlying sales contract". (*United Bank v Cambridge Sporting Goods Corp.,* 41 NY2d, at p 259.) If, on their face, the documents did not comply with the conditions of the letter of credit and Irving Trust honored the demand, notwithstanding, Fertico's remedy was to proceed against Irving Trust for breach of its contractual obligations. (*Frey & Son v Sherburne Co.,* 193 App Div 849, 853, mot for rearg den 194 App Div 960.) In any event, since Fertico was not a party to the letter of credit and had no

rights thereunder except to seek to enjoin honor of a draft in a case of "fraud in the transaction", a situation not applicable here, or to look to the bank for damages if it paid in violation of the terms of the letter, its action for fraud and conversion in drawing on the letter of credit is fatally flawed. (See *Kaufman v Simons Motor Sales Co.,* 261 NY 146; *Riley v Pierce Oil Corp.,* 245 NY 152; *Johnson v Blaney,* 198 NY 312, 316.) It is limited to such rights as are derived from the underlying sales transaction.

Accordingly, the order of the Supreme Court, New York County (TYLER, J.), entered February 17, 1983, which, *inter alia,* denied defendant's motion to dismiss the third cause of action and granted plaintiff's cross motion for partial summary judgment on said cause of action, should be modified, on the law, with costs and disbursements, to the extent of denying plaintiff's cross motion for partial summary judgment on the third cause of action, granting defendant's motion to dismiss said cause of action and, except as thus modified, affirmed.

KUPFERMAN, J. P., CARRO, MILONAS and KASSAL, JJ., concur.

Order, Supreme Court, New York County, entered on February 17, 1983, unanimously modified, on the law, to the extent of denying plaintiff's cross motion for partial summary judgment on the third cause of action granting defendant's motion to dismiss said cause of action and, except as thus modified, affirmed, with costs.