**BANCO DEL ESTADO, Plaintiff,**

**v.**

**NAVISTAR INTERNATIONAL TRANSPORTATION CORPORATION, et al., Defendants.**

No. 95 C 5889.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 25, 1997.

William D. Heinz of Jenner & Block, Chicago, IL; Roger A. Clark and T. Douglas Hollowell of Rogers and Wells, Washington, DC, for Plaintiff.

Richard M. Franklin, Martin R. Castro, William L. Schaller and Ellenore Angelidis of Baker & McKenzie, Chicago, IL, for Defendants.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Banco del Estado ("Banco") has brought a three-count Second Amended Complaint

("Complaint"[1]) against Navistar International Transportation Corporation and Navistar International Export Corporation (collectively "Navistar") in connection with Banco's payment under two letters of credit for the purchase of 80 buses sold by Navistar to Sidauto S.A. ("Siduato"). Banco, in its own right and as Sidauto's assignee, asserts claims for (1) fraud, (2) breach of contract and implied warranty of good faith and (3) breach of the implied warranty of fitness for a particular purpose.

Navistar has moved for dismissal of the entire Complaint under Fed.R.Civ.P. ("Rule") 12(b)(6), and the motion is fully briefed and ready for decision. For the reasons stated in this memorandum opinion and order, Navistar's motion is granted in part and denied in part.

*Rule 12(b)(6) Stand*

Familiar Rule 12(b)(6) principles require this Court to accept as true the Complaint's well-pleaded factual allegations, together with all reasonable inferences in Banco's favor (*Ledford v. Sullivan*, 105 F.3d 354, 356 (7th Cir.1997)). Dismissal is appropriate only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with [Banco's] allegations" (*id., quoting Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984)). Hence the following *Facts* section credits Banco's allegations in their entirety.[2]

*Facts*

In February 1993 Navistar's inventory included approximately 92 buses that it had manufactured in 1989 and 1990 for an ultimately aborted sale to a customer in the Dominican Republic. Because those buses had been in Navistar's inventory longer than any other group of comparably valued vehicles, Navistar executives (particularly those responsible for Latin American sales) were extremely anxious to sell them (¶¶ 8–9). In early February Navistar invited representatives of Sidauto (a Colombian company interested in importing buses to that country for public transportation) and Banco (a nationalized banking corporation organized under the laws of Colombia) to travel to the United States to view the buses (¶¶ 1, 2, 10).

On February 25, 1993 Navistar's representative in charge of sales to Colombia, Raul Echeverri ("Echeverri"), and Navitrans International Ltd. ("Navitrans") manager Andres Duque ("Duque") met in New Carlisle, Ohio with Sidauto's managers Julio Cesar Cortes and Antonio Cortes (collectively "Cortes Brothers"), Banco director Dario Restrepo ("Restrepo") and a branch manager of a Banco office in Bogota, Astrid McAllister ("McAllister"). Echeverri and Duque escorted McAllister, Restrepo and Cortes Brothers to an uncovered lot in which the buses were being stored. McAllister and Restrepo looked briefly at one snow-covered bus and at a second that had been moved inside, touched up with paint and otherwise prepared for the inspection visit (¶¶ 10–12).

On February 26, 1993 the parties met at Navistar's office in Miami to discuss a sale of the buses. Navistar's Director of Operations for Latin America Ramon Curros ("Curros") attended the meeting along with Echeverri, Duque, Restrepo, McAllister and Cortes Brothers (¶ 13). Curros represented to McAllister, Restrepo and Cortes Brothers that the buses were new and that the manufacture of the buses' bodies had been completed in 1992 and 1993 (¶¶ 14–15). Either or both of Curros and Echeverri further represented to McAllister, Restrepo and Cortes Brothers that the buses were "Model 1993 as a complete unit" (¶ 16). Navistar representatives did not disclose that the buses had vehicle identification numbers ("VIN numbers") that, pursuant to United States Department of Transportation regulations, identified the buses as model year 1990 by the appearance of the letter "L" as the tenth character of the VIN number (¶ 18).

---

1. At the time the current motion was filed, Banco's operative pleading was its First Amended Complaint ("FAC"). Then during the briefing process, this Court granted Banco's motion for leave to file the present Complaint.

2. All references to the Complaint are simply "¶ —," while its exhibits are cited "Ex. —,"

Relying on the representations of Navistar's Miami representatives, Sidauto entered into a sales agreement with Navistar (the "Sales Agreement") under which Sidauto agreed to purchase 80 buses from Navistar at a price of $23,025 each. Banco also executed the Sales Agreement to reflect its undertaking to finance the purchase by making a down payment to Navistar of $120,000 and by issuing two letters of credit for the balance of the purchase price (¶ 19; Ex. A). In part the Sales Agreement required that Navistar issue a pro forma invoice for the buses (¶ 20).

On April 6, 1993 and again on April 21, 1993 Navistar issued a pro forma invoice describing the buses in Spanish as "Buses nuevos, vendidos ano de 1993" (¶ 21). Banco's Federally Certified Judicial Interpreter has certified that those words translate to English as "New 1993 buses sold" (¶ 22).[3] Navistar submitted a notarized copy of the invoice to Incomex, the Colombian government agency responsible for import permits, and to the Colombian Customs Service (¶ 23). Knowing that Incomex would not issue an import permit for buses that were not of the current model year, Navistar had crafted the description so that the buses could be identified to Incomex as new 1993 model buses while simultaneously allowing Navistar to claim (if challenged) that Navistar meant only that the buses were *unused* as of their 1993 sale (¶¶ 27, 28). On April 27, 1993 Incomex issued an import permit for the buses, including a stamp on each page stating in Spanish that the buses were "New Merchandise Model 1993" (¶ 25; Ex. D).

On May 1, 1993 Navistar's Senior Group Vice President of International Operations Robert Johnson ("Johnson") met in Bogota with Echeverri, McAllister, Restrepo and Julio Cesar Cortes to celebrate the issuance of the Incomex permit. At that luncheon meeting Johnson and Echeverri inspected the Incomex permit and became concerned that the buses were falsely described as "Model 1993" buses when in fact they were 1990 model buses. Johnson did not believe that either McAllister or Restrepo was aware of that concern (¶¶ 29–31).

On May 3, 1993 Johnson, Echeverri and other Navistar people met with McAllister and Restrepo at a Banco office for approximately five hours, during which time the Navistar group sought to cause Banco to issue the first letter of credit (¶ 32). Navistar's application for that first letter of credit tracked the invoice by describing the buses as "Buses nuevos, vendidos ano de 1993." Johnson and Echeverri knew that (1) Banco assumed the description was accurate, (2) Banco further assumed that the description accurately conformed to the Incomex import permit (as it did) and (3) Banco was relying on the buses as security for the credit that it was issuing to Sidauto under the letters of credit (¶¶ 34–35). But neither Johnson nor Echeverri disclosed his already-described concerns to any Banco representative.

On May 4, 1993, after Navistar's Chicago headquarters faxed a verification with small corrections to the first letter of credit application, Banco issued a $968,625 letter of credit (¶¶ 33, 37–38). On June 11, 1993, after Johnson had once again visited Banco's Bogota office, where he again failed to raise his concerns about whether the buses were described inaccurately in both the letter of credit application and the Incomex permit, Banco issued a second letter of credit in the amount of $753,375 (¶¶ 39–40).

Navistar shipped 45 buses to Santa Marta, Colombia between May and August of 1993, and shipped the other 35 buses to Cartagena, Colombia in July 1993 (¶¶ 41–42). To receive payment under the letters of credit, Navistar submitted bills of lading and commercial invoices to the confirming banks representing that Navistar had shipped "new 1993 buses"

---

**3.** Navistar has separately submitted a certified translation of these words as performed by a Federally Certified Judicial Interpreter of its own. Navistar's interpreter has translated the Spanish words to English as "New buses, sold year of 1993" (Nav.Mem.Ex. 1). Because the English equivalent of the Spanish words is a factual matter, the principles reconfirmed in *Led-*

*ford* command the acceptance of Banco's translation at this time. But the litigants should be forewarned that given the material disparity in the translations, this Court plans to give serious consideration to exercising its discretion to appoint its own interpreter under Fed.R.Evid. 706(a)—and perhaps to proceed under *id.* 706(c) as well—when the case reaches the trial stage.

to Sidauto (¶ 43). In each instance Navistar was paid the amount requested under the letter of credit (¶ 44).

Upon their arrival in Colombia the buses were detained by the Colombian Customs Service ("Colombian Customs"). Colombian Customs determined after investigation that the buses were incorrectly described to Incomex as new 1993 model buses when, in fact, the buses' VIN numbers showed that they were from model year 1990(¶ 48). Navistar nonetheless continued to maintain that the buses were properly described as new 1993 model buses, making these representations to Colombian officials:

1. On June 25 and July 8, 1993 Navistar received letters from Colombian Customs requesting information about the year of manufacture of the buses. On July 26, 1993 Curros wrote to Colombian Customs that the buses were new and that the year of completion of their manufacture was 1993 (¶ 51; Ex. H).

2. On August 6, 1993 Curros sent identical letters to Colombian Customs officials in Bogota, Cartagena and Santa Marta certifying that the buses were finished by Navistar in 1993, that any characterization of the buses other than as described in the invoices lacked validity and that the buses were "new in every extension of the word" (¶ 52; Ex. I).

3. On August 24, 1993 Curros executed a certificate, which was notarized and authenticated at the Colombian Consulate in Miami, stating that the buses were totally new and finished in 1993. That certificate further stated that it and earlier certifications submitted by Navistar should be used as valid criteria to determine the year of manufacture and model of the buses (¶¶ 53–54; Ex. J).

4. On August 31, 1993 Curros executed another certificate repeating the representations in the August 24 certificate and adding that the buses were 1993 model buses (¶ 56; Ex. K).

In reliance on Navistar's continued representations that the buses were 1993 model bus-

es, Banco paid nationalization fees, storage and other related charges (¶ 50).

On November 22, 1993 Navistar provided Banco with Certificates of Origin for the buses that represented the buses as model year 1993 (¶ 57; Ex. L). Banco submitted those Certificates to Colombian Customs on November 24. Believing the Certificates to be valid, Colombian Customs ordered the release of 44 buses located in Bogota (¶¶ 58–59). Banco was paid $509,272 upon auction of those 44 buses. But in December 1993 Colombian Customs officially seized the 35 buses at Cartagena, and Colombian Customs is now seeking to annul its November 24, 1993 order releasing the 44 buses to Banco on the basis that Navistar's representations regarding the 1993 model year of the buses were false (¶¶ 61–63).

Pursuant to the application for the letters of credit, Sidauto has assigned to Banco all causes of action it may have against Navistar arising out of this matter (¶ 65). Thus Banco has standing to advance all of the claims in the Complaint.

### Procedural History

This case, originally assigned to this Court's colleague Honorable Brian Barnett Duff, was reassigned to this Court's calendar on October 10, 1996 after Judge Duff's retirement from regular active service under 28 U.S.C. § 372(a). Shortly before that Judge Duff had issued a September 24, 1996 opinion, 942 F.Supp. 1176, that dealt with an initial Navistar motion to dismiss, and that dismissed with prejudice Banco's claims for (1) breach of the presentment warranty under Section 5–111 of the Uniform Commercial Code ("UCC") (810 ILCS 5/5–111),[4] (2) negligent misrepresentation and (3) violation of the Illinois Consumer Fraud Act. That ruling in turn triggered Banco's filing of the FAC and then the Complaint now under attack.

### Breach of Contract and of Implied Good–Faith Warranty

#### Banco's Own Claim

Banco's claim in its own right under the Sales Agreement calls for a brief look at the

---

**4.** Citations to the Illinois Commercial Code (drawn from the UCC) will take the form "Sec-

tion —," omitting the "810 ILCS 5/" prefix.

relationships created in a transaction financed by a letter of credit. Section 5–103(1)(a)[5] defines a letter of credit as "an engagement by a bank or other person made at the request of a customer ... that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit." Illinois courts have often described the arrangement as one involving three separate contracts (*Village of Long Grove v. Austin Bank*, 268 Ill.App.3d 70, 73–74, 205 Ill.Dec. 900, 902, 644 N.E.2d 456, 458 (2d Dist.1994)):

> To understand the essence of a letter of credit transaction, it is imperative to focus on the unique nature of this type of security device. The court in *Jupiter Orrington Corp. v. Zweifel*, (1984), 127 Ill.App.3d 559 [82 Ill.Dec. 946], 469 N.E.2d 590 [(1st Dist.)] explained that three separate contracts are involved in this sort of agreement. The first is the contract between the beneficiary and the customer ... which is the contract underlying the letter of credit. The second is between the customer and the bank, when the customer offers collateral in exchange for the bank's issuance of a letter of credit. The third contract is between the bank and the beneficiary, wherein the bank agrees to pay the beneficiary an amount stated when and if the beneficiary complies with the terms cited in the letter of credit.

■ Here the relationship between Banco and Navistar involves the third of those contracts, with Banco as issuer and Navistar as beneficiary. Subject to very limited exceptions discussed below, that legal relationship is to be viewed as entirely independent from the underlying buyer-seller contractual relationship between Navistar and Sidauto (*Pioneer Bank v. Seiko Sporting Goods, U.S.A. Co.*, 184 Ill.App.3d 783, 788, 132 Ill. Dec. 886, 889, 540 N.E.2d 808, 811 (1st Dist. 1989) (citations omitted)):

> The letter of credit is independent of the underlying contract and the obligations under the letter of credit have no relationship

to compliance of the buyer or seller with the underlying contract. The issuer deals only with the documents which must comply with the terms of the letter of credit. When the documents presented comply with the conditions specified in the letter of credit, the issuer is authorized and obligated to pay. Conversely, when the documents do not comply, the issuer is not authorized to pay until discrepancies are waived by its customer. Essentially, the issuer's function regarding a letter of credit is ministerial.

Despite that description of its "ministerial" function, Banco attempts to state a cause of action against Navistar for breach of the Sales Agreement under one of two alternatives:

1. Navistar owed Banco a duty of good faith and fair dealing, as assertedly implied in every contract, because Banco was a signatory to the Sales Agreement.

2. Banco was a third-party beneficiary of the Sales Agreement, which incorporated by reference the letters of credit, a material term of which was that Banco would receive a security interest in the buses (¶ 96).

Banco cannot state a cognizable claim under either theory.

■ Banco's first theory is foreclosed by what Judge Duff held at 1181 n. 1:

> This court notes that [Banco] was not a party to the sales agreement and, thus, cannot sue for breach in its own right.

That ruling is law of the case. And as *Williams v. Commissioner of Internal Revenue*, 1 F.3d 502, 503 (7th Cir.1993) has put one branch of that doctrine:

> Litigants have a right to expect that a change in judges will not mean going back to square one.

Indeed, the situations under which this Court should reexamine Judge Duff's prior rulings are limited to cases of "clear error" or circumstances where new evidence or control-

---

5. Because neither party has made an issue of the state law that provides the rules of decision here—both parties have briefed the current motion on the assumption that Illinois law applies—this opinion follows the traditional practice in diversity cases of "simply appl[ying] the law of the state in which the federal court sits" (*Wood v. Mid–Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991)).

ling law has developed (*Peterson v. Lindner*, 765 F.2d 698, 704 (7th Cir.1985)).

■ Banco has made no such showing to alter the law of the case as developed by Judge Duff. It does not identify any new evidence or controlling law requiring a different conclusion as to Banco's status as a party to the Sales Agreement, and it is an understatement to say that Judge Duff's opinion certainly does not present an instance of "clear error." Although McAllister did sign the document as Banco's agent, that was solely to confirm Banco's role in financing the two-party transaction between Sidauto and Navistar. Nothing in the document evidences any intent by the parties other than to create the traditional relationship between Banco and Navistar of letter of credit issuer and beneficiary (Ex. A). And such cases as *Pioneer Bank*, 184 Ill.App.3d at 788, 132 Ill.Dec. at 889, 540 N.E.2d at 811 teach that such a relationship is legally independent from the underlying Navistar–Sidauto contract upon which Banco now rests its claim (see also 810 ILCS 5/5–114 cmt. 1).

■ Banco Mem. 10–11 asserts that Navistar's "fraud in the transaction," as recognized in Section 5–114(2), destroys that independence, permitting Banco's action against Navistar despite their formal issuer-beneficiary relationship. In that respect Navistar's response that Section 5–114(2) is an "extremely narrow" exception really misses the point, for fraud in the underlying sales agreement between buyer (Sidauto) and seller (Navistar) is just what Section 5–114(2) seeks to address (3 James White & Robert Summers, *Uniform Commercial Code* ("White & Summers") § 26–10, at 179–81 (4th ed.1995)). And Banco's allegations, taken as true for purposes of this motion, could well amount to one of those "rare situations of egregious fraud" to which Section 5–114(2) applies (*First Arlington Nat'l Bank v. Stathis*, 90 Ill.App.3d 802, 810, 46 Ill.Dec. 175, 182, 413 N.E.2d 1288, 1295 (1st Dist.1980) (citation omitted)).

But what Section 5–114(2) does not create by its terms is a cause of action for the letter of credit issuer who honors a beneficiary's draft *despite* "fraud in the transaction" and who later seeks to bring suit against that beneficiary for restitution. Instead the Section 5–114(2)(b) exception to the independence principle specifies only that a court of appropriate jurisdiction may *enjoin* the honoring of a beneficiary's draft *before* payment has been made. And while courts have extended that slightly to uphold an issuer's refusal to honor a draft even without an injunction (3 White & Summers § 26–10, at 178), that result has been strictly limited to cases in which the issuer was put on notice of "fraud in the transaction" *before* deciding whether to pay (*West Virginia Hous. Dev. Fund v. Sroka*, 415 F.Supp. 1107, 1114 (W.D.Pa.1976); *Fertico Belgium S.A. v. Phosphate Chems. Export Ass'n, Inc.*, 100 A.D.2d 165, 473 N.Y.S.2d 403, 409 (1984)). As the Complaint clearly sets out, Banco was not on notice of Navistar's fraud before it honored the letter of credit drafts. Hence this exception to the independence principle is inapplicable.

Of course an issuer is not without relief in the situation Banco describes. Section 5–114(3) provides a specific statutory remedy: Upon honoring a facially complying draft, the issuer is entitled to reimbursement *from its customer*. Thus Banco's recourse was a suit against Sidauto for such reimbursement. And while Sidauto's financial troubles in late 1993 may have caused such a remedy to have limited utility, that is precisely the risk Banco assumed upon issuing the letters of credit (3 White & Summers at 191):

> Even the most carefully drafted reimbursement agreement will be of no avail if the applicant is insolvent.... Even if the issuer retains the goods or a security interest in collateral, the value of these assets may be far less than the amount paid to the beneficiary.

■ Banco's attempted recovery as a third-party beneficiary of the Sales Agreement is similarly unavailing. As *E.B. Harper & Co. v. Nortek, Inc.*, 104 F.3d 913, 920 n. 4 (7th Cir.1997) (citations to earlier quoted cases omitted) has recently emphasized, Illinois law precludes such third party claims absent a manifest intent on the face of the contract to benefit the third party directly:

"In order for a third party to have a right to sue, '[t]he contract must be undertaken for the plaintiff's direct benefit and the contract itself must affirmatively make this intention clear.'" If the intent is not express on the face of the contract, "its implication at least 'must be so strong as to be practically an express declaration.'"

Illinois law further creates "a strong presumption that the parties to a contract intend for its provisions to apply only to them and not to third parties" (*Stichter v. Zuidema,* 269 Ill.App.3d 455, 461, 206 Ill.Dec. 929, 933, 646 N.E.2d 296, 300 (3d Dist.1995)).

Banco has identified no language in the Sales Agreement that implies (let alone states) that the agreement was undertaken for its direct benefit. To the contrary, the only language that even mentions Banco simply provides that it will finance the $120,000 down payment required of Sidauto (Ex. A). And while it may be true, as Banco alleges, that Navistar "knew" of an incidental benefit of the Sales Agreement that would run to Banco—in the form of Banco's security interest in the buses (¶¶ 94–95)—that fact certainly does not give rise to a strong inference of a direct and intended benefit so as to allow Banco to state a claim on the Sales Agreement itself (*MBD Enters., Inc. v. American Nat'l Bank,* 275 Ill.App.3d 164, 168, 211 Ill. Dec. 678, 681, 655 N.E.2d 1061, 1064 (1st Dist.1995)). Indeed, Banco's theory of recovery would seem to convert *every* secured lender into a third party beneficiary to the underlying contract of sale that it has financed.

In sum, Banco's allegations support no cognizable claim for recovery either (1) as a party to the Sales Agreement or (2) as a third party beneficiary to that contract. Banco's claim in its own right for breach of the Sales Agreement is dismissed.

*Banco as Sidauto's Assignee* [6]

 Navistar moves to dismiss Sidauto's breach of contract claim on the basis that the Sales Agreement does not contain an explicit requirement that Navistar provide 1993 mod-

el year buses. But the Complaint makes these allegations:

91. In the negotiation of the Sales Agreement, NAVISTAR represented that manufacture of the Buses bodies had been completed in 1992–3 and that the Buses could properly be described as new 1993 model buses as complete units, as more specifically alleged [earlier in the Complaint].

92. The Sales Agreement required NAVISTAR to issue a pro forma invoice for the Buses and NAVISTAR issued a pro forma invoice describing the Buses in Spanish as "new 1993 buses", which invoice became a material term of the Sales Agreement.

93. NAVISTAR breached the Sales Agreement because the Buses shipped were not new 1993 buses.

While Navistar R. Mem. 9 correctly points out that the literal text of the Sales Agreement "only required Navistar to issue a *pro forma* invoice—nothing more and nothing less," that argument is oversimplistic as a basis for dismissal. Admittedly it is not clear whether Banco means to suggest by the quoted allegations that the terms of the invoice were incorporated by reference into the Sales Agreement (see *Fisher v. Parks,* 248 Ill.App.3d 666, 677, 188 Ill.Dec. 632, 640, 618 N.E.2d 1202, 1210 (5th Dist.1993)), or whether it contends that the Sales Agreement and the invoice are to be construed together as separate instruments relating to the same transaction (see 12A I.L.P. *Contracts* § 235, at 45). In any event, though, Navistar has made no conclusive showing that the text of the Sales Agreement was intended "as a complete and exclusive statement of the terms of the agreement" (Section 2–202(b)), so at the very least Banco's allegations are sufficient to survive for now under the theory that Navistar's invoice language was a "consistent additional term" of the contract to which the parties had agreed (*Arcor, Inc. v. Textron, Inc.,* 960 F.2d 710, 716 (7th Cir. 1992)).

6. To minimize confusion, this opinion will refer to the claims that Banco advances as Sidauto's assignee as though they were still Sidauto's claims.

To be sure, the survival of Sidauto's claim hinges on precisely what was meant by the description "Buses nuevos, vendidos ano de 1993" (Ex. B). As stated earlier, Banco and Navistar have separately submitted translations of that language, each by a court-certified interpreter (Ex. C; Navistar Mem. Ex. 1).[7] And those readings diverge materially. Although those competing translations might appear to present a unique wrinkle in contract interpretation, only a moment's thought is needed to dispel any potential problem in that respect. After all, what the description actually *says* is a question of fact: That is readily seen in terms of the Spanish words themselves—they are what they are—and it is equally true of the English equivalent of those words (which is all that a translation is supposed to provide, effectively to put an English-speaking judge into the same position in dealing with the document that a Spanish-speaking judge would occupy if called upon to consider the original document).[8]

That being the case, in the present Rule 12(b)(6) context the Banco version must be credited, just as though the invoice had actually been in English and had falsely described the buses as "New 1993 buses sold." And in turn that means that Complaint ¶¶ 91–93, together with the Complaint's other allegations, state a viable breach of contract claim. Navistar's motion to dismiss, then, must be denied as to Banco's breach of contract claim as assignee of Sidauto.

*Breach of Implied Warranty of Fitness*

*Banco's Own Claim*

Section 2–315 states the implied warranty of fitness for a particular purpose:

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under [Section 2–316] an implied warranty that the goods shall be fit for such purpose.

As Navistar Mem. 10 argues, Banco has no cognizable claim under that warranty for suit in its own right. UCC Article 2's implied warranties "clearly contemplate a buyer/seller relationship" (*Rothe v. Maloney Cadillac, Inc.*, 119 Ill.2d 288, 292, 116 Ill.Dec. 207, 208, 518 N.E.2d 1028, 1029 (1988)), and Banco is not a "buyer" as that terms is defined in Section 2–103(a). As Judge Duff reasoned (Opinion at 10):

In this case, the Bank has failed to allege that it relied on Navistar to furnish suitable goods. Indeed, the Bank cannot allege that it relied on Navistar to furnish any goods.

Banco argues that, even absent privity of contract between buyer and seller, Illinois law extends Section 2–315 to both (1) persons in a position equivalent to that of a third party beneficiary to the sales contract and (2) those otherwise able to sustain a tort action against the seller (see *Slate Printing Co. v. Metro Envelope Co.*, 532 F.Supp. 431, 434 (N.D.Ill.1982)). But those exceptions still contemplate the existence of a buyer-seller relationship (or its essential equivalent) between the litigants. Each is simply a rule driven by Illinois policy to allow, under limited circumstances, plaintiff "buyers" to reach "remote sellers" with whom they have no privity of contract (see *Board of Educ. v. A,*

7. Banco's original Complaint included an Ex. B that in part translated the phrase as "newly sold buses year of 1993." Navistar now seeks to renew an argument, originally made before Judge Duff, that Ex. B was a judicial admission of that translation, effectively pleading Banco out of court. For its part, Banco attributes that first proffered translation to a paralegal's error. Judge Duff rejected Navistar's position in Opinion at 1179, finding that the original Spanish document (also part of Ex. B) and not an erroneous English translation was the representation that Navistar had made to Banco. As Banco identifies, Judge Duff's Opinion is law of the case—and it's plainly correct to boot. In all

events, Navistar has surely made no showing to warrant its request that this Court "reconsider and reverse" Judge Duff's ruling (Navistar Mem. 6).

8. This insight, and the straightforward conclusion to which it leads at this threshold motion-to-dismiss stage, renders unnecessary—because it effectively moots—any classical contract-law analysis in terms of ambiguity v. unambiguity of the translated language. That and perhaps other issues may well bear examination at later stages in the litigation.

*C & S, Inc.,* 131 Ill.2d 428, 461, 137 Ill.Dec. 635, 650, 546 N.E.2d 580, 595 (1989); *Frank's Maintenance & Eng'g. Inc. v. C.A. Roberts Co.,* 86 Ill.App.3d 980, 992–93, 42 Ill.Dec. 25, 34, 408 N.E.2d 403, 412 (1st Dist.1980)).

■ In any event, neither of those exceptions would allow Banco (even if it were an Article 2 "buyer," as it was not) to proceed under Section 2–315. Banco is not in the position of a third party beneficiary to the Navistar–Sidauto sales contract, and the "otherwise able to sustain a tort action" rule has been strictly limited by Illinois courts to cases of personal injury (*Board of Educ.,* 131 Ill.2d at 461, 137 Ill.Dec. at 650, 546 N.E.2d at 595; *Szajna v. General Motors Corp.,* 115 Ill.2d 294, 301–11, 104 Ill.Dec. 898, 900–05, 503 N.E.2d 760, 762–67 (1986)). Hence the motion to dismiss Banco's effort to sustain, in its own right, an implied warranty of fitness claim is granted.

### Banco as Sidauto's Assignee

■ Navistar contends that Sidauto's claim under Section 2–315 should be dismissed for failure to plead the requisite elements of that action. To state a cause of action for breach of implied warranty of fitness for a particular purpose, the buyer must allege that (1) the seller had reason to know of the particular purpose for which the buyer required the goods, (2) the buyer relied on the seller to select suitable goods and (3) the seller had reason to know of the buyer's reliance (see *Custom Automated Mach., v. Penda Corp.,* 537 F.Supp. 77, 83 (N.D.Ill. 1982)).

Navistar Mem. 14 argues that Banco has failed to plead the second of those elements, or "how and why a company like Sidauto—which is a skilled purchaser and importer of buses—would or did rely on Navistar's skill or judgment on the importability of the buses into Colombia." On that score, however, the Complaint clearly contains adequate allegations stating (1) that Sidauto relied on

Navistar's skill or judgment when Navistar represented that the buses could properly be described as new 1993 buses (1102) and (2) that Sidauto relied upon Navistar's skill or judgment to select buses suitable for import into Colombia (¶ 104). Again Navistar's motion to dismiss Sidauto's claim is denied.

■ Interestingly, Navistar has not moved to dismiss on the basis of Banco's failure to plead the third element of an implied warranty of fitness action: that Navistar had reason to know of Sidauto's reliance on Navistar's skill or judgment. Complaint ¶ 101 alleges only that Navistar knew of Sidauto's intended use—the first element identified above—and not that Navistar *knew that Sidauto was relying* on Navistar's skill to select particular buses. That omission plainly appears to be unintentional, for Banco Mem. 15 does assert such knowledge on Navistar's part.

It is conventional wisdom that a party's memorandum may not be used as a vehicle to overcome a pleading deficiency (*Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984)). In this instance Banco's pleading oversight does not appear to be attributable to reasons of undue delay, bad faith or dilatory motive, and a simple amendment to the Complaint would not unduly prejudice Navistar (*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)). Accordingly Banco is granted leave to file an amendment to the Complaint on or before March 11, 1997 for the sole purpose of curing that pleading defect.[9]

### Fraud

### Banco's Own Claim

■ On its current motion to dismiss Banco's fraud claim, Navistar once again points to the independence principle inherent in the letter of credit's issuer-beneficiary relationship. Suggesting that Banco's action

---

9. Navistar Mem. 15 suggests, though Navistar did not pursue the argument in its Reply, that Sidauto's warranty of fitness claim should be dismissed pursuant to Section 2–316(3)(b), because Cortes Brothers had an opportunity to inspect the buses. Complaint ¶¶ 11–12, however, alleges only that Cortes Brothers visited the New Carlisle, Ohio lot where the buses were stored and that McAllister and Restrepo (Banco's representatives) "looked briefly" at two buses. These allegations do not call for a ruling as a matter of law that Sidauto "examined the goods … as fully as [it] desired" (Section 2–316(3)(b)).

for fraud is an illegitimate effort to circumvent that principle, Navistar Mem. 7 argues (citation omitted):

> When Judge Duff dismissed with prejudice Banco del Estado's first count for breach of the presentment warranty under § 5–111 of the UCC, he eliminated any possibility for Banco del Estado to allege against Navistar (the beneficiary under the letters of credit) any duty to Banco del Estado. Any other ruling, allowing Banco del Estado to reach Navistar on some alternative theory, would completely undermine § 5–111 of the UCC, which is the sole governing authority for the issuer-beneficiary relationship in the letter of credit context. Navistar and Banco del Estado were legal strangers, owning no duty to one another, other than Banco del Estado's obligation to pay Navistar upon presentment, per § 5–111. "To hold otherwise would turn the banking industry upside down."

This opinion will not pause to evaluate the validity of Navistar's claim as to the exclusivity of the Section 5–111 remedy for an issuer whose sole involvement has been within the confines of a traditional letter of credit relationship. In this instance, however, Navistar's theory would raise an artificial barrier between the law and the special facts of this case. Here Navistar's relationship with Banco began with the February 25 and 26, 1993 meetings in New Carlisle, Ohio and Miami, at which time Curros and Echeverri made the first of Navistar's fraudulent misrepresentations to Banco. Those meetings *preceded* the inception of their formal issuer-beneficiary status.

Hence this case is materially different from the typical letter of credit transaction common to international trade—Navistar sought out Banco not simply to pay a draft under a letter of credit, but rather to *finance* the underlying transaction (see 3 White & Summers § 26–1, at 106) Surely the "independence" that ultimately guided the Banco–Navistar letter of credit relationship does not also absolve Navistar from liability for misrepresentations made *before* Banco's entry into that limited legal relationship (or, more precisely, made to induce Banco to do so).

Navistar had a strong motive to move some very stale inventory, and it certainly had no license to employ fraud to induce Banco to finance Sidauto's purchase of that inventory. This opinion will therefore turn to Navistar's attack on the merits of Banco's claim.

 Fraudulent inducement to enter into a contract is a form of common-law fraud (*Lagen v. Balcor Co.*, 274 Ill.App.3d 11, 17, 210 Ill.Dec. 773, 777, 653 N.E.2d 968, 972 (2d Dist.1995)). Such a claim requires (1) a statement by defendant (2) of a material nature, as opposed to an opinion, (3) that was untrue, (4) that was known or believed by the speaker to be untrue or made in culpable ignorance of its truth or falsity, (5) that was reasonably relied on by plaintiff to its detriment, (6) that was made for the purpose of inducing reliance and (7) that generated such reliance leading to plaintiff's injury (*Duran v. Leslie Oldsmobile, Inc.*, 229 Ill.App.3d 1032, 1039, 171 Ill.Dec. 835, 840, 594 N.E.2d 1355, 1360 (2d Dist.1992)). Although "[m]ere passive concealment of pertinent facts during a business transaction does not necessarily constitute fraud" (19A I.L.P. *Fraud* § 5, at 122), common law fraud may be based on the same type of failure to disclose that will support a Rule 10b–5 securities law claim (*General Motors Acceptance Corp. v. Central Nat'l Bank*, 773 F.2d 771, 778 (7th Cir.1985)).

 Navistar suggests that Banco has failed to satisfy the Rule 9(b) requirement that "the circumstances constituting fraud ... shall be stated with particularity." As identified in *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 777 (7th Cir.1994), that "rule is said to serve three main purposes: (1) protecting a defendant's reputation from harm; (2) minimizing 'strike suits' and 'fishing expeditions'; and (3) providing notice of the claim to the adverse party." Although in some situations this may be too restrictive a statement of Rule 9(b)'s demands, it generally compels an identification of the person making the representations and the time, place and content of the misrepresentation, as well as the method by which the misrepresentation was communicated to the plaintiff (*Katz v. Household Int'l, Inc.*, 36 F.3d 670, 675 (7th Cir.1994)). Those requirements have been summarized

as "the who, what, when, where, and how: the first paragraph of any newspaper story" (*DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990)).

Banco's allegations in that regard plainly satisfy Rule 9(b). As for the first knowing misrepresentations made by Navistar officials to induce Banco to finance Sidauto's purchase, the Complaint carefully sets out each required detail of the circumstances surrounding those statements. At the February 26, 1993 meeting held in Navistar's Miami offices, Curros and Echeverri are said to have told McAllister, Restrepo and Cortes Brothers (1) that the buses were new, (2) that the buses' bodies were completed in 1992 and 1993 and (3) that the buses were "Model 1993 as a complete unit" (¶¶ 14–16, 67). Additionally the Complaint alleges in detail the circumstances surrounding the issuance of the two pro forma invoices containing the language "Buses nuevos, vendidos ano de 1993," as well as the transmission through Navitrans of one such invoice to Incomex, leading to the import permit being stamped "New Merchandise Model 1993" (¶¶ 21–28, 68–69).[10]

Further, the Complaint goes on to detail a number of occasions when a Navistar official failed to disclose material information to Banco once the initial misrepresentations had been made. During the February 26, 1993 meeting in Miami, Curros and Echeverri failed to disclose to Banco that the buses had VIN numbers identifying them as model year 1990 and that the buses had been stored outdoors for three years (¶¶ 17–18, 76). And while Johnson and Echeverri had at least two opportunities to disclose to Banco their concerns that the Incomex permit contained a false description of buses—their May 1, 1993 luncheon with Banco and Sidauto representatives celebrating the permit, and their May 3, 1993 five hour meeting at the Banco office in Bogota—neither made such disclosure (¶¶ 29–36, 77, 79). Johnson then failed to do so a third time when meeting with Banco officials at the Bogota office on June 11, 1993(¶ 39).

Navistar Mem. 5–6 also takes issue with Banco's failure to allege what discussions took place between representatives of Navistar and Banco regarding the phrase "Buses nuevos, vendidos ano de 1993." But as Banco responds, it is not clear that any such discussions ever took place. Banco itself has no knowledge of any conversation to that effect (Banco Mem. 8), and Banco is not required to allege facts within the exclusive possession of Navistar (*Wislow v. Wong*, 713 F.Supp. 1103, 1105 (N.D.Ill.1989)). Even if any such discussion occurred (and even should that discussion appear exculpatory in terms of Navistar's alleged fraud), it would at best create an issue of fact as to Navistar's fraud.

In sum, Banco has sufficiently stated the circumstances of Navistar's fraudulent misrepresentations (and omissions) to overcome the present motion to dismiss on the basis of Rule 9(b). Banco's own fraud claim survives.

*Banco as Sidauto's Assignee*

Banco alleges that Sidauto would not have purchased the buses had it known that they could not properly be described to Incomex as 1993 model buses (¶ 87). Because Sidauto's claim of fraud is based on the same misrepresentations upon which Banco says it relied—Curros and Echeverri's statements at the February 26, 1993 Miami meeting (at which Cortes Brothers were also present) (¶ 67) and Navistar's failure to disclose the VIN numbers identifying the buses as model year 1990(¶ 87)—Navistar's Rule 9(b) attack

---

**10.** Navistar takes issue with Banco's ¶ 69, which alleges "on information and belief" that Navistar issued the pro forma invoices with a false description knowing that Incomex would not issue an import permit for buses that were not of the current model year. Information-and-belief pleading of fraud is generally disfavored (*Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683–84 (7th Cir.1992)). In this case, though, Navistar's knowledge of Colombian import rules is "within the exclusive control" of Navistar, and Banco has "plead[ed] the grounds for [its] suspicions" (*id.* at 684). More specifically, Banco has alleged the details of Navistar's initial misrepresentations (¶¶ 13–16); the suspicious consecutive timing of the preparation of the deceptive pro forma invoice, the notarization of an invoice before the Colombian Consulate in Miami and the submission of that invoice to Incomex (¶¶ 21, 23); and Johnson's and Echeverri's May 1, 1993 concerns about the false description of the model year on the import permit when they inspected that permit at the Bogota luncheon (¶¶ 29–31).

on this count is equally unsound. Although Banco does not allege whether or not Navistar ever voiced concerns to Sidauto about the model year description on the Incomex permit (Navistar Mem. 4–5), again the existence of any such discussion would at most create an issue of fact as to Navistar's fraudulent intent and Sidauto's reasonable reliance on the earlier misrepresentations. Hence Navistar's motion to dismiss Banco's claim of fraud as assignee of Sidauto is also denied.

### Conclusion

This Court grants Navistar's motion to dismiss Count II (Breach of Sales Agreement and Implied Warranty of Good Faith) and Count III (Breach of Implied Warranty of Fitness) only to the extent that those counts attempt to state a cause of action on behalf of Banco in its own right. Banco is granted leave to file an amendment to the Complaint on or before March 11, 1997 for the sole purpose of curing the pleading defect identified in this opinion as to Banco's Count III claim as Sidauto's assignee. In all other respects, Navistar's motion to dismiss is denied.

Navistar is ordered to answer the Complaint (as further amended) on or before March 25, 1997. This action is set for a status hearing at 9 a.m. April 11, 1997 to discuss the necessary discovery and any other procedural steps required to lead to as early a trial as possible.