[925 NYS2d 61]

ONE STEP UP, LTD., Appellant, v WEBSTER BUSINESS CREDIT CORPORATION, Respondent.

First Department, June 14, 2011

### APPEARANCES OF COUNSEL

*Lazarus & Lazarus, P.C.*, New York City (*Harlan M. Lazarus* of counsel), for appellant.

*Kravet & Vogel, LLP*, New York City (*Joseph A. Vogel* of counsel), for respondent.

### OPINION OF THE COURT

MOSKOWITZ, J.

Plaintiff brought this action seeking the return of $250,000 that defendant obtained when it drew on a standby letter of credit. Plaintiff had opened the letter of credit with HSBC, naming defendant as beneficiary, to provide additional collateral

for defendant's extension of further financing to nonparty Luxury Ventures, LLC, doing business as Henricks Jewelers (Henricks). Despite plaintiff's creative theories, the plain wording of the letter of credit and underlying documents precludes recovery. In particular, plaintiff cannot use breach of warranty under Uniform Commercial Code § 5-110 to convert the legitimate exercise of contractual rights into a cause of action. Indeed, defendant's actions were permissible, even expected, under the financing documents involved in this case. Plaintiff, a sophisticated business entity and an affiliate of the company that borrowed money from defendant, should have understood the risks when it applied for the letter of credit and took a subordinated junior participation interest in advances that defendant made to the borrower. Accordingly, it was appropriate to dismiss this case at the pre-answer stage.

Defendant provides secured loans and cash management services in the form of revolving credit and asset-based financing. One of its borrowers was Henricks, a retail jewelry business that operated in Florida. Defendant and Henricks entered into a secured revolving credit agreement with a $5 million limit on February 28, 2005. In 2007, Henricks filed a chapter 11 bankruptcy petition with the United States Bankruptcy Court for the Middle District of Florida. As part of Henricks's confirmed plan of reorganization, defendant agreed to provide exit financing to Henricks. Accordingly, defendant and Henricks entered into an Amended and Restated Loan and Security Agreement, dated August 1, 2008 (the Loan Agreement).

As the Loan Agreement was in the nature of a *secured* revolving credit agreement, the amount Henricks could borrow depended on a formula tied to underlying collateral: "Lender agrees to make advances ('Advances') to Borrower in an amount at any one time outstanding not to exceed an amount equal *to the lesser of* (i) the Maximum Revolver Amount *less* the Letter of Credit Usage, or (ii) the Borrowing Base *less* the Letter of Credit Usage." Henricks's Borrowing Base was calculated according to the following formula:

> "90% of the Eligible Accounts Receivable, *plus* 40% of the Cost value of Eligible Inventory [if before December 31, 2008] *or* 85% of the Net Liquidation Value of Eligible Inventory as set forth in the daily collateral reports delivered to Lender, [*minus*] the aggregate amount of Availability Reserves, if any, established by Lender under Section 2.1 (a) (ii)."

Thus, the calculations underlying the Borrowing Base tied Henricks's assets to the amount Henricks could borrow.

Section 2.1 (a) (ii) of the Loan Agreement regarding "Availability Reserves" provided that "during the period commencing on January 1, 2009, through the Maturity Date, Lender shall have the right to establish reserves in such amounts, and with respect to such matters, as Lender in its Permitted Discretion shall deem necessary or appropriate." The Loan Agreement defined "Availability Reserves" as "such reserves as the Lender from time to time determines in its Permitted Discretion as being appropriate to reflect the impediments to the Lender's ability to realize upon the Collateral." The Loan Agreement defined "Permitted Discretion" as "a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment."

The Loan Agreement also anticipated deviation from the formula set forth in section 2.1 (a) (ii). Section 2.4 anticipated "Overadvances":

> "If at any time or for any reason, the amount of Obligations (other than Bank Product Obligations) owed by Borrower to Lender pursuant to Sections 2.1 and 2.11 [dealing with letters of credit] is greater than either the Dollar or percentage limitations set forth in Sections 2.1 or 2.11, (an 'Overadvance'), Borrower immediately shall pay to Lender, in cash, the amount of such excess . . . ."

Nevertheless, the Loan Agreement capped the amount Henricks could borrow regardless of its underlying assets. This amount, that the parties termed the "Maximum Revolver Amount," "for the period commencing on the Closing Date through December 31, 2008" was $1.5 million. "[F]or the period commencing on January 1, 2009, through the Maturity Date [April 30, 2012]," the Maximum Revolver Amount increased to $2.5 million.

In October 2008, three months after Henricks and defendant entered into the Loan Agreement, Henricks foresaw that it might experience seasonal cash flow problems during the upcoming holiday selling season. It therefore requested defendant's consent to fund its cash shortfall through the end of the year. However, because this would result in a section 2.4 Overadvance, that would trigger certain immediate repayment obligations on Henricks's part, the parties executed Amendment No. 1 to the Loan Agreement on October 31, 2008. Amendment No.

1 added new section 4.9 to the Loan Agreement. That section called for the letter of credit that Henricks arranged through plaintiff to provide additional collateral for defendant (the Kairos L/C). The Kairos L/C was in the principal amount of not less than $250,000 and was set to expire on January 31, 2009, a date shortly after the holiday selling season ended. Section 4.9 provided that defendant could draw on the Kairos L/C in an amount that would be "equal to any Overadvance then existing, calculated as if the Seasonal Amount was $0) (the 'Determined Overadvance')." Amendment No. 1 defined "Seasonal Amount" as "a sum equal to the outstanding undrawn principal amount of the Kairos L/C" (i.e., $250,000). Thus, a Determined Overadvance meant the amount of the existing Overadvance (Loan Agreement § 2.4), with the collateral value of the Kairos L/C set at $0. This meant that the Kairos L/C could not count as an asset to reduce the amount of the Determined Overadvance. The parties do not dispute that defendant could draw upon the Kairos L/C any time after January 15, 2009 and before the Kairos L/C expired on January 31, 2009, provided that a Determined Overadvance existed on that date.

In October 2008, simultaneously with its entry into Amendment No. 1 with Henricks, defendant entered into a letter agreement with plaintiff whereby plaintiff took a subordinated junior participation in the right to collateral for the advance under the Loan Agreements in the maximum amount of $250,000 (the Junior Participation Agreement). Plaintiff's rights under this agreement were expressly without recourse to defendant. Moreover, defendant's liability to plaintiff was expressly limited to its own willful misconduct or gross negligence.

On November 3, 2008, as planned in Amendment No. 1 and upon plaintiff's application, HSBC Bank issued a $250,000 irrevocable standby letter of credit with defendant as beneficiary. The letter of credit was payable upon defendant's certification that: (1) a "draw event" had occurred under section 4.9 of Amendment No. 1 and (2) the amount of the drawing did not exceed the Determined Overadvance.

On December 31, 2008, Henricks failed to make a scheduled $100,000 payment to defendant. On January 1, 2009, by the terms of the Loan Agreement, the Maximum Revolver Amount automatically increased, by $1 million, to $2.5 million. By notice dated January 9, 2009, defendant advised Henricks of various defaults under the Loan Agreement, including: (1) Henricks's failure to make the $100,000 installment payment that was due

on December 31, 2008; (2) Henricks's failure to turn credit card payments from Henricks's customers over to defendant; (3) Henricks's failure to provide a copy of its current business plan; (4) Henricks's failure "to have caused each depository of Borrower to be subject to a Control Agreement by November 7, 2008"; and (5) that actual sales were "less favorable" than Henricks had projected. The notice further advised that, although defendant had not taken action to stop the Maximum Revolver Amount from increasing to $2.5 million, it had established an initial $900,000 reserve against the Borrowing Base pursuant to section 2.1 (a) (ii) of the Loan Agreement (giving defendant "the right to establish reserves in such amounts, and with respect to such matters, as Lender in its Permitted Discretion shall deem necessary or appropriate"). In addition, defendant offered to enter into a "forbearance agreement" whereby "Lender and Borrower could agree to Lender's forbearance on other than a day-to-day basis," provided that Henricks cured the defaults, including by making the $100,000 payment immediately.

On January 20, 2009, defendant certified to HSBC that a draw event had occurred and that the amount Henricks sought to draw on the Kairos L/C did not exceed the Determined Overadvance. The "Borrowing Base Certificate" that Henricks subsequently certified on January 22, 2009 confirmed Henricks's financial situation as of January 20, 2009. It is undisputed that this Borrowing Base Certificate reported that Henricks was in an Overadvance position of $183,880 on January 20, 2009, including the value of the Kairos L/C. When the Kairos L/C was valued at $0, as section 4.9 of Amendment No. 1 to the Loan Agreement required, Henricks's Determined Overadvance grew to $433,880 ($183,880 + $250,000).

On January 27, 2009, defendant received payment from HSBC under the Kairos L/C. As a result, plaintiff received its $250,000 junior subordinated participation interest in the Loan Agreement pursuant to its Junior Participation Agreement with defendant.

Because plaintiff believed that defendant had unfairly drawn on the Kairos L/C, plaintiff commenced this lawsuit alleging breach of the Junior Participation Agreement between defendant and plaintiff, breach of warranty under UCC 5-110 (a) (2), breach of the covenant of good faith and fair dealing, unjust enrichment, and money had and received. Defendant moved to dismiss the complaint and the motion court granted the motion in its entirety (2009 NY Slip Op 33258[U]).

Because the Kairos L/C was a letter of credit, plaintiff alleges that defendant breached the warranty it owed to plaintiff by virtue of UCC 5-110 (a) (2), that provides:

> "(a) If its presentation [of a letter of credit] is honored, the beneficiary [here, defendant] warrants:
>
> . . .
>
> "(2) [t]o the applicant [plaintiff] that the drawing does not violate any agreement between the applicant and beneficiary or any other agreement intended by them to be augmented by the letter of credit."

■ Plaintiff concedes that it is not relying on the Junior Participation Agreement to support its breach of warranty claim. However, there is no other contract between the parties, and plaintiff does not identify the "other agreement" that the parties intended to augment with the letter of credit. Accordingly, it is not at all clear that UCC 5-110 applies in the first instance.

■ However, assuming that the Loan Agreement and Amendment No. 1 would qualify as an "other agreement intended by them to be augmented by the letter of credit," plaintiff alleges that defendant breached this warranty by wrongfully certifying to HSBC that a draw event involving an "Event of Default" under the Loan Agreement had occurred. However, the documentary evidence demonstrates that defendant's draw request was well within defendant's contractual rights. The Borrowing Base Certificate shows that the Determined Overadvance at the time of defendant's draw request was $483,880 (the Overadvance of $183,880 + $250,000 [taking the value of the L/C down to $0 removed it as an asset and therefore added $250,000 to the Overadvance amount]). Thus, the draw request of $250,000 did not exceed the Determined Overadvance.

Unable to demonstrate that the draw request itself was improper, plaintiff invokes UCC 5-110 (a) (2), that prohibits a drawing that violates "any other agreement intended by them to be augmented by the letter of credit." Plaintiff takes issue with defendant's setting a $900,000 Availability Reserve under its Loan Agreement with Henricks. Plaintiff fails to explain how defendant's draw request under the Kairos L/C could ever constitute a violation of the manner in which defendant set the Availability Reserve under the Loan Agreement. Nevertheless, assuming that the drawing could somehow be a violation of the

Loan Agreement, plaintiff contends that defendant failed to exercise good faith in the context of its Permitted Discretion when it set an Availability Reserve in the amount of $900,000. Plaintiff alleges that defendant set the Availability Reserve "for the sole purpose of creating an Overadvance, so as to afford [defendant] a pretext upon which to draw upon the Kairos L/C."[1]

■ Plaintiff is incorrect. Again, defendant acted well within its contractual rights in setting the Availability Reserve at $900,000. Plaintiff does not contest that numerous Events of Default occurred under the Loan Agreement, including that Henricks failed to make a $100,000 payment on December 31, 2008, that sales were far below projections and that Henricks had failed to turn over credit card payments from its customers to defendant. Permitted Discretion was defined as the exercise of reasonable business judgment from the perspective of a secured asset-based lender. Henricks's numerous Events of Default all point to its becoming a serious loan risk. Moreover, it had recently emerged from bankruptcy. Still, defendant honored the $1 million increase in the Maximum Revolver Amount under the Loan Agreement. By allowing the increase in the Maximum Revolver Amount to go through, defendant kept the Loan Agreement, and with it Henricks's exit financing, in place. Setting the reserve at or below the $1 million increase was not only within defendant's contractual rights, but was also expected, considering the bad shape in which Henricks appeared to be. By setting an Availability Reserve of $900,000, defendant prevented Henricks's borrowing ability from increasing, thereby reducing its own risk and Henricks's potential for greater debt.

Plaintiff claims that defendant's establishment of the reserve at $900,000 looks extremely suspicious because it more or less equals the increase in the Maximum Revolver Amount (it is actually off by $100,000, the same amount that Henricks had to pay immediately or defendant would cancel its financing altogether).[2] That the amounts were nearly the same is actually indicative of good faith. Defendant set a reserve at no more and no less than its increased risk. Under the terms of the Loan

---

1. Although plaintiff provides no explanation, I presume plaintiff means that by setting an Availability Reserve of $900,000, defendant reduced the amount that Henricks could borrow and that that amount should have been $2.5 million because the Maximum Revolver Amount had increased to that amount on January 1, 2009.

2. Plaintiff alleges in the complaint that defendant "created an Availability Reserve under the Loan Agreement in an amount *exactly* equal to the

Agreement, defendant was perfectly entitled to do this. Notably, Henricks, the real party in interest, never challenged the reserve amount.

■ Plaintiff claims that the Borrowing Base Certificate is not admissible because it is a document that Henricks created and therefore defendant cannot certify it as a business record. We disagree. A business record will be admissible if that record "was made in the regular course of any business and . . . it was the regular course of such business to make it, at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter" (CPLR 4518 [a]). Documents that are prepared in connection with or in contemplation of litigation are not admissible (*National States Elec. Corp. v LFO Constr. Corp.*, 203 AD2d 49, 50 [1994]).

Section 2.2 of the Loan Agreement contemplated that Henricks would send a Borrowing Base Certificate to defendant every time Henricks requested an advance. Indeed, the Loan Agreement sets forth the form of the Borrowing Base Certificate in exhibit B-1 and the Borrowing Base Certificate at issue conforms to it. According to the Loan Agreement, defendant would rely on these Borrowing Base Certificates in determining whether to make proceeds available. Thus, the Borrowing Base Certificate was made in the regular course of business, it was the regular course of business for Henricks to create these records, Henricks had a duty under the Loan Agreement to create these records and the Borrowing Base Certificate was made contemporaneously with the transactions or within a reasonable time thereafter. Further, Henricks certified at the bottom of the Borrowing Base Certificate at issue that "the information set forth is true and complete." This certification, along with Henricks's contemporaneous business duty to create the Borrowing Base Certificate, "gave the records in question sufficient indicia of reliability to qualify as business records" (*Pencom Sys. v Shapiro*, 237 AD2d 144, 144 [1997]; *see also People v Cratsley*, 86 NY2d 81, 88-91 [1995] [third-party psychologist's report was a business record where report was prepared for program and state agency, in accordance with agency's program requirements, and counselor for agency was familiar with report]; *Corsi v Town of Bedford*, 58 AD3d 225, 230 [2008], *lv denied* 12 NY3d 714 [2009] [company that produced photograph was under a

amount available under the Kairos L/C." However, defendant set the Availability Reserve at $900,000. The amount available under the Kairos L/C was $250,000.

contractual duty to produce photographs according to certain specifications and on a regular basis]; *People v DiSalvo*, 284 AD2d 547, 548 [2001] [court properly admitted "dump tickets" that third party generated and Westchester County routinely relied upon in creating its invoices]; *Plymouth Rock Fuel Corp. v Leucadia, Inc.*, 117 AD2d 727, 728 [1986] [where plaintiff used information on delivery tickets to prepare its invoices, delivery tickets were properly admitted as business records although nonparty contract truckers supplied the information on them]). I note that plaintiff has never disputed the accuracy of the amounts in the Borrowing Base Certificate. Nor does it dispute that the documents defendant interposed were prepared other than in the ordinary course of business.

■ Nevertheless, even if the Borrowing Base Certificate does not qualify as a business record and is therefore hearsay, defendant submitted it not for the accuracy and truth of the inventory, receivables and debt it reflects, but to show that it acted in good faith in that defendant relied on the numbers from the Borrowing Base Certificate. There is therefore no need to qualify the document as a business record. All that is necessary is to show that defendant received it, a fact that plaintiff does not contest. Moreover, according to Official Comment 2 to UCC 5-110, the accuracy of the Borrowing Base Certificate is irrelevant to the cause of action for breach of warranty:

> "It is not a warranty that the statements made on the presentation of the documents presented are truthful nor is it a warranty that the documents strictly comply under Section 5-108 (a). It is a warranty that the beneficiary has performed all the acts expressly and implicitly necessary under any underlying agreement to entitle the beneficiary to honor . . . In many cases, therefore, the documents presented to the issuer will contain inaccurate statements (concerning the goods delivered or concerning default or other matters), but the breach of warranty arises not because the statements are untrue but because the beneficiary's drawing violated its express or implied obligations in the underlying transaction."

However, the Second Department appears to disagree with the Official Comment (*see Ocwen Fed. Bank v DeLuxe Bldg. Sys.*, 304 AD2d 805, 807 [2003] [by submitting drawing certificate to issuer, beneficiary of letter of credit warranted that all

statements in the documents were true]). Regardless, the truthfulness of the Borrowing Base Certificate is not an issue in this case, because plaintiff does not dispute that the amounts it reflects are accurate. It only disputes the certificate's admissibility.

■ Plaintiff also argues that the date of the Borrowing Base Certificate was January 22, 2009 and therefore could not justify defendant's draw request two days earlier on January 20, 2009. However, by January 20, 2009, Henricks already had numerous instances of default, such as the failure to make the December 31, 2008 installment payment. Moreover, the UCC only requires the beneficiary [defendant] to warrant that "the *drawing* does not violate any agreement between the applicant and beneficiary." Although defendant's draw request occurred on January 20, 2009, the actual transfer of funds (i.e., the drawing) did not occur until January 27, 2009, after defendant had received the Borrowing Base Certificate.

The letter of credit that plaintiff guaranteed was collateral for the seasonal Overadvances. Otherwise, defendant would never have agreed to additional financing and Henricks would have had to shut down in October 2008 when it began experiencing cash flow problems. In exchange for the letter of credit, plaintiff received the Junior Participation Agreement. By virtue of that arrangement, it now has an interest in the Loan Agreement on a subordinated basis. From the face of the documents, plaintiff knew or should have known that defendant could cash in on the letter of credit if Henricks ran into further financial difficulty. Moreover, plaintiff does not dispute that it is an affiliate of Henricks. It was therefore in a better position than most to assess the underlying risk. Plaintiff went into this financing arrangement with its eyes wide open and cannot now complain that the wool was pulled over them.

■ As for the remaining causes of action, the breach of contract claim fails for lack of a contract between the parties. There is no contractual relationship between the applicant and the beneficiary of a letter of credit (*see Fertico Belgium, S.A. v Phosphate Chems. Export Assn.*, 100 AD2d 165, 173-174 [1984], *appeal dismissed* 62 NY2d 802 [1984]). Meanwhile, plaintiff does not allege that defendant breached the only agreement that does exist between them, i.e., the Junior Participation Agreement. The claim for breach of the covenant of good faith and fair dealing is not viable because defendant did not deprive plaintiff of the benefits of any contract to which plaintiff was a

party (*see Moran v Erk*, 11 NY3d 452, 456 [2008] ["(t)he implied covenant of good faith and fair dealing between the parties to a contract embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" (internal quotation marks and citations omitted)]). Pursuant to the Junior Participation Agreement, plaintiff received the exact result for which it had bargained, its junior subordinated interest in Henricks's debt.

The claims for unjust enrichment and money had and received are not viable because express contracts govern the same subject matter (*see Vitale v Steinberg*, 307 AD2d 107, 111 [2003]). The loan agreements covered defendant's right to impose reserves, the Kairos L/C covered defendant's right to draw upon the credit, and the Junior Participation Agreement covered plaintiff's right to receive its junior interest in the loans to Henricks up to the amount of defendant's draw on the Kairos L/C. Moreover, defendant was in no way unjustly enriched. It merely received what it was entitled to under the express contracts at issue, while plaintiff received the benefit of its bargain.

Accordingly, the order of the Supreme Court, New York County (Bernard J. Fried, J.), entered December 22, 2009, that granted defendant's motion to dismiss the complaint, should be affirmed, without costs.

SAXE, J.P., RICHTER, MANZANET-DANIELS and ROMÁN, JJ., concur.

Order, Supreme Court, New York County, entered December 22, 2009, affirmed, without costs.